Filed 10/18/21  In re Lea S. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re LEA S. et al., Persons Coming Under the Juvenile Court Law. | B309813 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 19CCJP04944A–B) |
| Plaintiff and Respondent, | |
| v. | |
| K.K., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Brett Bianco, Judge.  Affirmed in part, reversed in part and remanded.

Anne E. Fragasso, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

The juvenile court exercised dependency jurisdiction over Lea S. (born 2016) and Naomi S. (born 2018) after parents K.K. (mother) and K.S. (father) were arrested for leaving the children alone in a locked vehicle with an outside temperature of 99 degrees and an interior temperature of 111 degrees. The court also sustained allegations both parents abused marijuana while caring for the children. After the parents failed to reunify with the children, the court terminated their parental rights and approved the children for adoption.

Mother appeals, contending the court erred by (1) summarily denying her Welfare and Institutions Code section 388[1] petition requesting further reunification services; (2) denying the application of the beneficial parental relationship exception to adoption; and (3) failing to conduct adequate inquiry under the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.; ICWA). We reject the first two contentions. Respondent Los Angeles County Department of Children and Family Services (DCFS) concedes the ICWA error, so we conditionally reverse the order terminating parental rights and remand with directions to comply with ICWA inquiry requirements.

## BACKGROUND

### *Jurisdiction and Disposition*

The family came to the attention of DCFS when, on August 1, 2019, the parents left the children in a vehicle alone on a hot day with the windows open three inches while the parents went into a store to buy beer. The children were red and sweating profusely, with temperatures outside at 98 degrees and inside at 111 degrees. Naomi was banging on the window and crying.

---

[1] Statutory citations refer to the Welfare and Institutions Code.

2

Bystanders had to break out the vehicle's window to remove the children.

Police responded and arrested the parents for child endangerment. Security video from the store showed the parents inside the store for around 10 minutes. The inside of the parents' vehicle was dirty, with trash and clothes strewn about. The parents appeared disheveled, and the children were dirty. Police suspected the family was living in the vehicle.

A social worker interviewed mother. She reported the parents had gone into the store to buy beer, claiming they had only been gone "two to five minutes." She called her lapse in judgment a "mistake" and said the children were fine. She reported she and father drank beer and smoked marijuana, but not while caring for the children.

The social worker also interviewed father. He claimed he and mother were in the store for about two and a half minutes. He admitted he and mother drank beer on the weekends and he had smoked marijuana two days earlier.

DCFS filed a petition alleging three counts of neglect pursuant to section 300, subdivision (b). Count b-1 alleged the parents placed the children in a detrimental and endangering situation when they left the children alone in a vehicle with the temperature outside at 98 degrees and the temperature inside at 111 degrees. Counts b-2 and b-3 alleged the parents were current marijuana abusers and were under the influence while caring for the young children.

The court ordered the children detained from the parents and granted the parents monitored visitation. However, the criminal court had issued a protective order in favor of the

3

children and against the parents, so visits could not begin until that order was modified.

The children were initially placed with a paternal great aunt, but she could not care for them, so they were moved. The paternal grandparents lived in Delaware; they expressed interest in moving to California and caring for the children.

At the adjudication hearing held on September 10, 2019, the juvenile court sustained the section 300 petition and set the matter for disposition.

In August and September 2019, mother had three positive drug tests and failed to show for two tests. Father had two positive drug tests and failed to show for two tests. In October 2019, mother had three negative weekly drug tests and father had four negative weekly drug tests.

During the parents' criminal proceeding, the criminal court ordered them to complete a year of parenting classes. The protective order was also modified to allow the parents peaceful contact with the children, enabling monitored visitation. DCFS reported in October 2019 the parents consistently attended monitored visitation with the children. The children were hesitant to engage with the parents and appeared unfamiliar with them, although the children were getting more comfortable.

At the disposition hearing on November 5, 2019, the court declared the children dependents and removed them from the parents. The court ordered reunification services for the parents, including a full drug program, drug testing, aftercare, a 12-step program, Alanon, a parenting program, and individual counseling. The court granted monitored visitation as permitted by the criminal court.

*Reunification Period*

The criminal court convicted the parents of child endangerment. It granted them probation and community service; it ordered them to complete a 52-week parenting program, to comply with DCFS, and not to leave the children unattended; and it issued a protective order in favor of the children through 2022.

The paternal grandparents had not moved to California, so the children remained with their foster parents, who were designated as foster-adopt caregivers. The children were thriving. The foster parents fulfilled the children's basic needs; they advocated for specialized medical, mental health, and academic needs; and they facilitated visitation. The children received in-home individual counseling. Naomi received speech services. Lea was potty-trained. The children appeared happy and attached to the foster parents.

During this period, the parents missed a few monitored visits and nearly half of their weekly drug tests. Father had not enrolled in any court-ordered programs. Mother had enrolled in an outpatient substance abuse program but declined two drug/alcohol tests for the program and missed eight of her weekly tests for DCFS. During early visits with the children, the parents did not interact much with them but improved during later visits. Between December 2019 and March 2020, the parents engaged well with the children during visits, playing games, looking at picture books, and bringing snacks. When visits switched to video calls in March 2020 due to the COVID-19 pandemic, the children initially had trouble engaging, but they improved.

The court ultimately terminated reunification services on August 31, 2020, finding the parents failed to make substantial progress in their case plans. Mother objected to the termination of services. The court set a hearing under section 366.26.

*Permanency Planning Period*

The children began preschool in September 2020. Naomi continued in-home speech and occupational therapy services. The parents continued drug testing with negative test results. Mother tested positive for alcohol through her substance abuse treatment program on September 30, 2020.

The parents continued in-person and virtual visits. The foster parents reported the children did not engage with the parents and became irritable after a few minutes. During one visit, the children said they did not want to engage with the parents and the parents did not speak for most of the visit. Afterward, the children had elevated emotions and struggled to sit for dinner or calm down for bedtime. The next week, Naomi did not engage with the parents, but Lea remained engaged for the full 30 minutes. Afterward, Naomi was irritable and struggled to fall asleep.

During virtual visits in December 2020, the children varied between engagement and screaming and running off screen. After each visit, they were dysregulated. Without prompting, Lea said she did not want to have visits with the parents anymore. The visitation monitor noted during in-person visits at this time the parents were unable to redirect the children and had trouble engaging them outside of playing with a phone. Naomi experienced downward spirals after visits, including anger, hitting, nightmares, and screaming at nighttime. She was having accidents and refusing food. Lea appeared sadder and

6

clung to the foster parents, telling them she did not want to see the parents. When the paternal grandparents appeared unexpectedly for a virtual visit, Naomi cried for food and was inconsolable. She spent the rest of the visit off screen cuddling with her foster mother.

The parents missed three virtual visits in September 2020, three in October 2020, one in November 2020, and three in December 2020.

By November 2020, the paternal grandparents still had not moved to California, but continued to express their wish to become legal guardians over the children.

The children's therapist reported they were participating in psychotherapy with the foster parents and were progressing toward their objectives. Naomi improved her reflexes and sensory processing issues. The foster parents had been instrumental in implementing the therapist's suggestions during the week.

DCFS recommended the court terminate parental rights. The foster parents wanted to adopt the children, and their home study was approved. In the view of DCFS, the foster parents had "demonstrated their ongoing love for the children and their unwavering commitment to provide the children with a stable home through adoption." The children called them "mom" and "dad."

*Mother's Section 388 Petition and Termination of Parental Rights*

On January 5, 2021, mother filed a petition pursuant to section 388 to modify the order terminating reunification services and to grant her additional services. She reported, "I have completed a full drug program during which I tested clean, a

7

parenting program, I have a sponsor, I have participated in the 12 Step Program, AA/NA Zoom meetings. I would be starting an aftercare program. I have also participated in individual counseling." She claimed the modification was in the children's best interests because she had "maintained a strong bond with my children and it would be in their best interests to be raised by their mother. I would like an opportunity to reunify with them and to raise them, in a loving nurturing home. I have learned a lot from my classes and realize I made a terrible mistake that I would never repeat."

The petition included supporting documentation. As reflected in the test results mother submitted, she tested positive for cocaine on August 4, 2020 and tested positive for alcohol on September 30, 2020.

At the combined hearing on mother's section 388 petition and termination of parental rights pursuant to section 366.26, mother's counsel noted the section 388 petition was late and requested a continuance. DCFS's counsel did not oppose the continuance and noted it was not ready to argue. Nevertheless, the court accepted the late-filed petition and denied the continuance. The court noted a late-filed petition is "taken with a dose of skepticism and is not a good cause for a continuance. We're concerned here with expedience hearing of cases to provide stability and permanency for children and a continuance on these facts would not be consistent with those objectives."

The court denied the section 388 motion, reasoning: "It may be true that mother is now having a wake up moment that circumstances are beginning to change—and hopefully that is the case that she will for the sake of herself and those around her take these issues seriously and continue to work on her path

8

towards recovery, but it cannot be said that there's a change in circumstances.

"Nor could it be said it would be in the minor's best interest to delay permanency and stability any further. So for those reasons and the fact that the 388 was untimely—for all of those reason[s], the 388 is denied."

The court found the children were adoptable and no exception to adoption applied. It reasoned the parents did not maintain regular visitation, so they did not establish a bond with the children. Further, the benefits of adoption outweighed the benefits from their parental relationship, so adoption was in their best interests. And returning the children to the parents would be detrimental to them. The court terminated the parents' rights and designated the current foster parents as the prospective adoptive parents.

## DISCUSSION

### I.      The Court Properly Denied the Section 388 Petition

Mother contends the juvenile court improperly denied her section 388 petition without holding a hearing. We review the denial of a section 388 petition for abuse of discretion. (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.) We find none.

Section 388 allows a parent to petition the court to modify or set aside a previous order due to changed circumstances or new evidence. The petition must be verified and "shall set forth in concise language any change of circumstances or new evidence which are alleged to require such change of order or termination of jurisdiction." (§ 388, subd. (a)(1).)

A parent seeking to modify an order must " 'make a prima facie showing to trigger the right to proceed by way of a full hearing.' " (*In re Anthony W., supra,* 87 Cal.App.4th at p. 250.)

9

That showing has two parts: "(1) a genuine change of circumstances or new evidence" and "(2) revoking the previous order would be in the best interests of the children." (*Ibid.*) "If the liberally construed allegations of the petition do not show changed circumstances such that the child's best interests will be promoted by the proposed change of order, the dependency court need not order a hearing." (*Ibid.*)

The juvenile court acted within its discretion in concluding mother's petition did not set forth a prima facie showing of changed circumstances. Mother's progress in her programs since termination of reunification services was commendable, but incomplete. Although she claimed she completed a drug program and tested clean, her own supporting documentation showed she tested positive for cocaine on August 5, 2020—just a few weeks before the court terminated reunification services on August 31, 2020—and she tested positive for alcohol on September 30, 2020. There is indication in the record she had not completed her substance abuse program. She said she "would be starting an aftercare program," indicating she had not started the program, let alone made progress in it. Nor had she progressed beyond monitored visitation with the children.

Mother's progress came only after the court terminated reunification services, suggesting she did, in fact, have a "wake up moment," as the juvenile court noted. But at that point it was too late. "Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) Mother had more than 12 months after the children's removal to address the issues that brought them into the dependency system. Her efforts were lackluster. She missed visits and missed eight drug

tests. At the visits she did attend, the children had trouble engaging, although they improved over time.

After reunification services were terminated, the quality of the visits degraded. The children did not want to engage with the parents and became dysregulated after the visits, causing trouble for them at dinner and bedtime. Unprompted, Lea expressed she did not want to visit with the parents anymore. Naomi experienced downward spirals after visits, including anger, hitting, nightmares, and screaming at nighttime. She was having accidents and refusing food. Lea appeared sadder and clung to the foster parents, telling them she did not want to see the parents. For mother's part, she missed 10 virtual visits between September and December 2020.

Mother argues she showed changed circumstances because "substantial compliance is compliance" with her reunification plan, citing *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1341. That case did not involve a section 388 petition, so it has little bearing on the issue here. In any case, even if that were the standard, the juvenile court did not abuse its discretion in finding no prima facie case of even "substantial compliance" based on the record here.

Nor did the juvenile court abuse its discretion in finding mother failed to show an extension of reunification served the children's best interests. The children were thriving with their foster-to-adopt parents, who were dedicated to supporting them and helping them progress in their therapy and other services. The children viewed them as their parents, calling them "mom" and "dad." In her petition, mother claimed she had established a bond with the children, but she offered no evidence to support that conclusory claim. The record shows the contrary. "At this

11

point in the proceedings, on the eve of the selection and implementation hearing, the children's interest in stability was the court's foremost concern, outweighing any interest mother may have in reunification." (*In re Anthony W., supra,* 87 Cal.App.4th at pp. 251–252.)

Mother argues the following "best interest" factors set forth in *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532 supported modifying the order terminating reunification: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of the problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." These factors have been criticized for failing to account for the focus on the children's interest in stability after reunification services have been terminated. (See *In re J.C.* (2014) 226 Cal.App.4th 503, 527.) In any case, the factors supported denial of mother's section 388 petition here. The parents' neglect was serious—they left their young children alone in a locked, dangerously hot vehicle so they could buy beer. They struggled with drug and alcohol abuse. These problems were undoubtedly challenging, and mother had only begun to address them. In contrast, the children's bond with their foster parents was strong while their bond with mother was weak and appeared to be getting weaker. We cannot say the juvenile court abused its discretion in summarily denying the section 388 petition without a hearing.[2]

---

[2] Mother finds it troubling the juvenile court viewed her late-filed section 388 petition with "a dose of skepticism." We cannot be sure what exactly the court meant by that comment.

## II. The Parental Bond Exception to Adoption Did Not Apply

Mother contends the juvenile court should have applied the beneficial parental relationship exception to adoption found in section 366.26, subdivision (c)(1)(B)(i). This exception requires a parent to establish by a preponderance of the evidence "the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 629.) As our high court recently clarified, the statute sets out three elements: "(1) regular *visitation and contact* and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Id.* at p. 631.)

The first element looks to whether the parents visit consistently, to the extent permitted by court orders. (*In re Caden C., supra,* 11 Cal.5th at p. 632.) Courts must consider this element through the lens of the best interests of the child, that is, how visits facilitate the development of significant and positive emotional attachment between the parent and child. (*Ibid.*)

The second element looks to whether the child would benefit from continuing the parental relationship. (*In re Caden C., supra,* 11 Cal.5th at p. 632.) "[T]he relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the

---

Nevertheless, whether or not viewed with "a dose of skepticism," mother's petition did not set forth a prima facie case to justify holding a hearing so the court acted within its discretion in summarily denying it.

13

"positive" or "negative" effect of interaction between the parent and child, and the child's particular needs.' " (*Ibid.*)

Finally, the third element requires the court to decide "whether it would be harmful to the child to sever the relationship and choose adoption." (*In re Caden C., supra,* 11 Cal.5th at p. 633.) The court must look to "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Ibid.*) For this element, the court must examine "whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.] 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Id.* at p. 633.)

Our review combines both substantial evidence and abuse of discretion standards. We review the factual findings on the first two elements for substantial evidence. (*In re Caden C., supra,* 11 Cal.5th at p. 639.) We review the juvenile court's determination of the third element—the detriment to the child from the termination of parental rights—for abuse of discretion. (*Id.* at p. 640.) Although two standards are involved, this "hybrid" standard of review "simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Id.* at p. 641.)

14

Although mother missed a few monitored visits during the reunification period and missed 10 virtual visits during the permanency placement period, DCFS does not press the visitation element on appeal. Following DCFS's lead, we will assume mother satisfied the first element of consistent visitation. She has failed to demonstrate the other two elements.

Substantial evidence supported the juvenile court's finding the children would not benefit from a continuing relationship with mother. The children were relatively young when they were removed from the parents' custody—ages 3 and 18 months. After they were removed, they never appeared entirely comfortable visiting with the parents, let alone bonded with them. As early as October 2019, the children were hesitant to engage with the parents and appeared unfamiliar with them. At the outset of the reunification period, the parents did not interact much with them during visits. When visits switched to video calls in March 2020 due to the COVID-19 pandemic—which assuredly presented challenges to both the parents and children—the children again had trouble engaging. The children and parents were both improving during visits over this period, although that improvement did not prevent the juvenile court from terminated reunification services in August 2020.

Then, as outlined in the previous section, the parents' relationship with the children deteriorated. Clearly, the parents' visits were negatively affecting them. Lea went so far as to say she did not want to visit the parents anymore. Mother's 10 missed virtual visits near the end of 2020 deprived the family of more opportunities to create a bond. Rather than creating beneficial parent-child relationship, mother's interaction with the children appeared to have a detrimental effect on them.

15

For similar reasons, the juvenile court acted within its discretion in finding no harm to the children from severing their relationship with mother. The children were clearly bonded with the foster parents, calling them "mom" and "dad" and seeking their comfort during and after visits with the parents. The foster parents were dedicated to supporting the children's development and ensuring they received the services they needed. The children were thriving in their care. Weighed against the evidence that mother lacked a strong bond with the children, this evidence supported the juvenile court's finding that severing the parent/child relationship would not " 'deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child." (*In re Caden C., supra,* 11 Cal.5th at p. 633.)

## III. DCFS's ICWA Inquiry Was Inadequate

Mother contends DCFS did not conduct sufficient inquiry under ICWA regarding father's possible Native American heritage before the juvenile court found the children were not Indian children.[3] DCFS concedes its inquiry was inadequate. We will therefore conditionally reverse the order terminating parental rights and remand for further proceedings consistent with ICWA requirements.

*ICWA Proceedings*

When the children were detained, mother denied any Native American heritage. Father reported he had Native American heritage with the "Natico Tribe." He was not

---

[3] Although mother does not claim any Indian ancestry, she may raise ICWA notice errors on appeal related to father. (*In re A.W.* (2019) 38 Cal.App.5th 655, 663.)

16

registered and did not know if the paternal grandparents were registered.

Mother filed an ICWA-020 form indicating she had no known Indian ancestry. The juvenile court found it had no reason to know ICWA applied as to mother.

Father filed an ICWA-020 form claiming he was a member of or eligible for membership with the "Nanticoke" tribe. He claimed his great-great grandmother Nancy S. was a member of the tribe. The juvenile court ordered DCFS to investigate the claim.

DCFS submitted ICWA notices to the Bureau of Indian Affairs, the Secretary of the Interior, and three Cherokee tribes. They indicated the children's possible membership in the Cherokee and "Naticoke" tribes. "Naticoke" was an apparent misspelling of the Nanticoke tribe. The notices listed father's parents and grandparents, but not father's great-great grandmother Nancy S. For father's mother, the notices listed a phone number and potential membership in the Cherokee and "Naticoke" tribes. For father's father, the notices listed only a birthplace of Maryland or Atlantic City. For one set of father's grandparents, the notices listed a birth date, a birth location of Delaware, and membership in the "Naticoke" tribe for father's grandmother, and listed a partial birth date, date of death, and membership in the Cherokee tribe for father's grandfather. For father's other set of grandparents, the notices listed only their names.

In October 2019, DCFS reported it had contacted the Eastern Band of Cherokee Indians, the United Keetoowah Band of Cherokee Indians, and the Cherokee nation for updates on the ICWA notices. The Eastern Band of Cherokee Indians responded

17

in a letter that the children were not Indian children.  At that point, DCFS had received no response from the other tribes. DCFS reported the "Naticoke" tribe was not a federally recognized tribe, so it sent notices to the Bureau of Indian Affairs and the Department of the Interior.

Based on this record, at the November 5, 2019 disposition hearing, the juvenile court found it had no reason to know the children were Indian children.

### *Current ICWA Law*

ICWA applies to " 'an unmarried individual under age 18 who is either a member of a federally recognized Indian tribe or is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe.' " (*In re A.M.* (2020) 47 Cal.App.5th 303, 315; see § 224.1, subd. (b).) Throughout dependency proceedings, an agency has "an affirmative and continuing duty to inquire whether a child for whom a petition under section 300 . . . may be or has been filed, is or may be an Indian child.  The duty of inquiry begins with the initial contact, including, but not limited to, asking the party reporting the child abuse or neglect whether he or she has any information that the child may be an Indian child."  (§ 224.2, subd. (a); see Cal. Rules of Court, rule 5.481(a).)

If the child is placed in custody of the agency, the agency "has a duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled."  (§ 224.2, subd. (b).)

18

At the first court appearance of the parties, "the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child. The court shall instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (§ 224.2, subd. (c).)

As of recent amendments effective January 2019, state law dictates that a court or agency has "reason to know" a child is an Indian child if, inter alia, "[a] person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child," or "[a]ny participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child." (§ 224.2, subds. (d)(1), (3).)

If the court or social worker has "reason to believe" that an Indian child is involved in the proceeding, the court or social worker "shall make further inquiry regarding the possible Indian status of the child." (§ 224.2, subd. (e).) The phrase "reason to believe" was not statutorily defined in the 2019 amendments, although it is now.[4] Once there is a "reason to believe" a child

---

[4] Section 224.2, subdivision (e) was amended effective September 18, 2020 to define information triggering a "reason to believe" as "information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe. Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know enumerated in paragraphs (1) to (6), inclusive, of subdivision (d)." (Stats. 2020,

19

may be an Indian child, the new law sets out the steps for the agency's inquiry, including, "(A)  Interviewing the parents, Indian custodian, and extended family members to gather the information required in paragraph (5) of subdivision (a) of Section 224.3 [information required in ICWA notice].  [¶]  (B)  Contacting the Bureau of Indian Affairs and the State Department of Social Services for assistance in identifying the names and contact information of the tribes in which the child may be a member, or eligible for membership in, and contacting the tribes and any other person that may reasonably be expected to have information regarding the child's membership status or eligibility.  [¶]  (C)  Contacting the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility. . . .  Contact with a tribe shall include sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case." (§ 224.2, subd. (e).)

Once ICWA notice is triggered, "the notice to the tribe must include a wide range of information about relatives, including grandparents and great-grandparents, to enable the tribe to properly identify the children's Indian ancestry."  (*In re A.M., supra,* 47 Cal.App.4th at p. 317.)  That information includes " '[a]ll names known of the Indian child's biological parents, grandparents, and great-grandparents, or Indian custodians,

---

ch. 104, § 15.)  The court in this case made the ICWA determination prior to this amendment, so the version in effect at that time applies.  (See *In re T.G.* (2020) 58 Cal.App.5th 275, 290, fn. 14.)

including maiden, married, and former names or aliases, as well as their current and former addresses, birth dates, places of birth and death, tribal enrollment information of other direct lineal ancestors of the child, and any other identifying information, if known.' " (*Ibid.*, quoting § 224.3, subd. (a)(5)(C).) " 'Any violation of this policy requires the appellate court to vacate the offending order and remand the matter for further proceedings consistent with ICWA requirements.' " (*In re A.M., supra,* at p. 317.)

We review the juvenile court's finding that sufficient inquiry was made under ICWA for substantial evidence. (*In re D.N.* (2013) 218 Cal.App.4th 1246, 1251.)

### ICWA Inquiry

DCFS concedes it did not follow the statutory dictates for sufficient ICWA inquiry in this case. Father's ICWA-020 form listed the Nanticoke tribe and identified his great-great grandmother as a member. There is no dispute that created a "reason to believe" the children might have been Indian children, triggering an obligation for further inquiry. DCFS was required to interview "the parents, Indian custodian, and extended family members to gather the information" for ICWA notices. (§ 224.2, subd. (e).) The record does not disclose DCFS interviewed any paternal family members to gather information related to the children's Indian status, even though a paternal great aunt and the paternal grandparents were both involved in the case and available to DCFS.

The notices sent to the Cherokee tribes, the Bureau of Indian Affairs, and the Department of the Interior were also deficient. The notices misspelled the Nanticoke tribe, and provided little to no information on father's parents and grandparents beyond their names. At a minimum, the notices

21

should have identified father's relatives' " 'maiden, married, and former names or aliases, as well as their current and former addresses, birth dates, places of birth and death, tribal enrollment information of other direct lineal ancestors of the child, and any other identifying information, if known.' " (*In re A.M., supra,* 47 Cal.App.4th at p. 317, quoting § 224.3, subd. (a)(5)(C).)

Mother argues DCFS failed to include father's great-great grandmother Nancy S. in the ICWA notices. She would be the children's great-great-great grandmother. Such a distant relative is not listed in section 224.3 alongside the relatives who must be included in ICWA notices. (§ 224.3, subd. (a)(5)(C) [listing the Indian child's biological parents, grandparents, and great-grandparents for ICWA notices]; see *In re D.N., supra,* 218 Cal.App.4th at p. 1252 [information about children's great-great grandmother not required for ICWA notices].)

Nevertheless, "[n]otice given by DCFS pursuant to ICWA must contain enough information to permit the tribe to conduct a meaningful review of its records to determine the child's eligibility for membership." (*In re S.E.* (2013) 217 Cal.App.4th 610, 615.) When DCFS has been given specific information that a more distant relative is a member of an Indian tribe, the inclusion of that information in ICWA notices is "required regardless of the lack of a preprinted line on the Judicial Council form asking for it." (*Id.* at pp. 615–616 [requiring ICWA notices to include child's great-great grandfather, whom mother claimed was Native American]; see *In re E.H.* (2018) 26 Cal.App.5th 1058, 1073 [interpreting federal ICWA regulations to require notice to include child's great-great grandparent's information].) Father specifically informed DCFS his great-great grandmother was a

22

member of the Nanticoke tribe, and he provided her name. DCFS should have included that information in the ICWA notices it sent.

Mother also asserts in her brief on appeal that no notice was sent to the Delaware Tribe of Indians, Oklahoma, which she claims is federally recognized and includes the Nanticoke tribe. She is right there is no such notice in the record, but she cites no evidence to support her assertions that (1) the Delaware Tribe of Indians, Oklahoma is federally recognized and (2) the Nanticoke tribe is part of it. She may be right on both points; DCFS concedes in passing that notice must be sent to the Delaware Tribe of Indians. However, without more thorough briefing or evidentiary support, we will not direct notice to be given to the Delaware Tribe of Indians. The juvenile court may do so if appropriate when it addresses these issues on remand.

To summarize, on remand, DCFS must interview the paternal great aunt and paternal grandparents, as well as any other relatives who may have relevant information about the children's Indian status. Once DCFS conducts this further inquiry, it must send new notices to the relevant tribes and entities containing the biographical information it has collected regarding father's relatives. The notices must include father's great-great grandmother Nancy S. and any of her identifying information DCFS has collected. The juvenile court should address on remand whether notice to the Delaware Tribe of Indians is required.

**DISPOSITION**

The order denying mother's section 388 petition is affirmed. The order terminating parental rights is conditionally reversed. The matter is remanded for further proceedings to satisfy ICWA requirements. Should the juvenile court conclude ICWA does not apply and the children are not Indian children, it should reinstate the order terminating parental rights. If a tribe indicates the children are Indian children, the juvenile court should conduct further proceedings in compliance with ICWA.

In all other respects, the order terminating parental rights is affirmed.


OHTA, J.*

We Concur:



GRIMES, Acting P. J.



STRATTON, J.

---

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.